**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

**PPC BROADBAND, INC.**                                                              **PLAINTIFF/
                                                                        COUNTER-DEFENDANT**

**v.**                          **Case No. 4:22-cv-00204-LPR**

**PERFECTVISION**                                                              **DEFENDANT/
MANUFACTURING, INC.**                                              **COUNTER-CLAIMANT**

<u>**ORDER**</u>

This is a patent-infringement case.  Plaintiff PPC Broadband, Inc. (PPC) is (allegedly) the owner of U.S. Patent No. 7,118,416 (the '416 Patent).[1]  The Patent "relates generally to the field of cable connectors for CATV [cable television] systems, and more particularly to a cable connector with an elastomeric band which seals the cable connector to a cable."[2]  Defendant PerfectVision Manufacturing, Inc. (PVM) is allegedly infringing on that Patent.[3]  This case is at the claim-construction stage.  The parties dispute the meaning of certain phrases found in the claims of the Patent.  So the Court is tasked with resolving those disputes by "construing" the relevant claims in the '416 Patent.[4]

**BACKGROUND**

This Background Section provides a 30,000-foot overview of the '416 Patent, the Patent prosecution history, and the litigation history between the parties concerning this Patent.

---

[1] Compl. (Doc. 1) ¶¶ 1–2.

[2] Ex. A ('416 Patent) to Compl. (Doc. 1) at 19, col. 1 ll. 6–9.  Throughout this Order, page citations to the record follow the ECF page numbers at the top of each document.

[3] Compl. (Doc. 1) ¶ 3.

[4] *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996).

## I.    Technology Overview of the '416 Patent

The '416 Patent concerns an invented solution to a common problem in the field of cable connectors for CATV systems.[5]  In simple terms, the '416 Patent concerns the connection point between a connector and a coaxial cable.[6]  Coaxial cable is a type of electrical cable consisting of "an inner or center conductor surrounded by a dielectric material" engineered to block signal interference.[7]  With traditional connectors, gaps occur at the cable connection point; in turn, the gaps leave the connection exposed to weather and contaminants.[8]  When moisture and/or contaminants enter the exposed connection, they can interfere with the performance of the cable signal.[9]  Although "[m]any attempts have been made to ensure that cable connections are sealed against moisture [and contaminants] from the environment," many of those past attempts involved complex cable connector body designs made up of two or more components.[10]

According to PPC, the '416 Patent uniquely addresses this problem in a way that is both less complex and less expensive than past attempted solutions.[11]  The patented invention purportedly does so by utilizing an elastomeric band to seal the connection from moisture and contaminants.[12]  Unlike other cable connectors on the market, the connectors described by the

---

[5] *See* Ex. A ('416 Patent) to Compl. (Doc. 1) at 19, col. 1 ll. 6–37.

[6] *See* Oct. 16, 2023 Markman Hr'g Tr. (Rough) at 3.

[7] Ex. A ('416 Patent) to Compl. (Doc. 1) at 19, col. 2 ll. 45–49.

[8] *See id.* at 19, col. 1 ll. 13–18; *see also* Oct. 16, 2023 Markman Hr'g Tr. (Rough) at 3 ("[H]ere we're primarily focused on how do you attach the connector to a cable in [a] way in which it stays on the cable and in a way in which keeps moisture and other [contaminants] from getting inside the cable and interfering.").

[9] *See* Oct. 16, 2023 Markman Hr'g Tr. (Rough) at 3, 8.

[10] *See* Ex. A ('416 Patent) to Compl. (Doc. 1) at 19, col. 1 ll. 16–21.

[11] *See* Oct. 16, 2023 Markman Hr'g Tr. (Rough) at 6.

[12] *Id.* at 6, 8.

'416 Patent produce (again, according to PPC) a very secure connection while also accepting a wide range of cable sizes, making them "universal" in application.[13]

As depicted below, the solution claimed in the '416 Patent is a connector with:  (1) a nut, (2) a barbed post, (3) a connector body, (4) an elastomeric band that is "disposed within a cavity" that is "formed in part by a shoulder" of the "compression fitting," and (5) a compression fitting connected to the body via a sleeve on the compression fitting.[14]



barb of the post

nut | post | body | elastomeric band | compression fitting

as the compression fitting slides onto the body, the elastomeric band deforms against the cable jacket radially outward of the barb of the post, creating a mechanical interlock between the band, the cable, and the barb of the post

---

[13] *See id.* at 6–7.  The connectors described in the '416 Patent were apparently designed to replace certain less effective, more expensive, and/or more difficult-to-use alternative connector designs, many of which left gaps and exposed connection points to moisture.  *See, e.g., id.* at 3–4 (discussing crimp connectors that required strength and expertise to install).

[14] *See* Ex. A ('416 Patent) to Compl. (Doc. 1) at 20, col. 3 ll. 40–55.  The instant illustration was provided by PPC on page 12 of its Opening Claim Construction Brief.  *See* Doc. 72 at 12.  The Court finds it to be a useful visual representation of what is generally described by the Patent.  The Court acknowledges that it is only a rough representation of a particular embodiment of the Patent.  *See id.*

The Patent claims a solution that both:  (1) mechanically secures the connector to the coaxial cable, and (2) extends the moisture barrier to the connector by sealing the connection.[15] The Patent specifically claims an "elastomeric band" (depicted above in purple) that seals the connection point.[16]  The elastomeric band changes shape or "deform[s]" upon compression of the compression fitting.[17]  Unsurprisingly, the elastomeric band is made from elastomers.[18]  The specification notes that "[e]xamples of elastomers include any thermoplastic elastomer (TPE), silicone rubber, or urethane."[19]  And "[t]he key properties [of the elastomeric band] are resilience, resistance to creep, resistance to compression set, and the creation of a good grip with the cable jacket."[20]

In engineering, the term "creep" is used to describe the tendency of a material to permanently deform or fail after application of "constant stress."[21]  Similarly, "compression set" refers to the reduced ability (or capacity) of a soft material—like an elastomer—"to return to its original thickness after prolonged compressive stresses . . . ."[22]  And "[t]his loss of resiliency (memory) may reduce the capability of an elastomeric . . . seal . . . to perform over a long period

---

[15] *See* Oct. 16, 2023 Markman Hr'g Tr. (Rough) at 22; Ex. A ('416 Patent) to Compl. (Doc. 1) at 19, col. 1 ll. 25–48.

[16] *See* Ex. A ('416 Patent) to Compl. (Doc. 1) at 19, col. 1 ll. 31–37.

[17] *See id.*, col. 1 l. 66–col. 2 l. 3.

[18] *See id.* at 20, col. 3 ll. 12–20.

[19] *Id.*, col. 4 ll. 37–38.

[20] *Id.*, col. 4 ll. 38–41.

[21] *See Creep Deformation of Metals*, UNIV. OF CAMBRIDGE, DEP'T OF MATERIALS SCIENCE & METALLURGY (last visited Jan. 14, 2025), https://www.doitpoms.ac.uk/tlplib/creep/printall.php.

[22] *See Compression Set Testing*, STOCKWELL ELASTOMERICS (last visited Apr. 4, 2025), https://www.stockwell.com/compression-set-testing/ (explaining how to mathematically measure the "compression set" of elastomers).  The degree of compression set is expressed as a percentage.  *Id.*  The lower the percentage a given material receives on a compression set test, the better that material resists permanent deformation under a given set of compressive stresses.  *Id.*  Simply put, less (meaning lower) compression set equates to greater ability of an elastomer to return to its original condition.

of time."[23]  This loss of resiliency can result in "permanent set" in the seal that may cause leakage over time.[24]

According to PPC, the connectors covered by the '416 Patent are designed to ensure that cable connections are sealed against moisture and other environmental hazards by using an elastomeric band that can resist creep and/or compression set.[25]  Specifically, a seal is created when "[a]xial movement of the compression member onto [the] connector body causes the elastomeric band to seal an outer layer of the cable to the connector to isolate the inside of the connector from environmental influences."[26]  The illustration below depicts the difference between the axial and radial directions.[27]  Axial movement is simply movement in the axial



direction.

---

[23] *Id.*

[24] *Cf. id.* ("[L]oss of resiliency (memory) may reduce the capability of an elastomeric gasket, seal[,] or cushioning pad to perform over a long period of time.  The resulting permanent set that a gasket may take over time may cause a leak . . . .").

[25] *See* Ex. A ('416 Patent) to Compl. (Doc. 1) at 20, col. 4 ll. 38–41.

[26] *See id.* at 19, col. 1 ll. 33–37.

[27] The instant illustration was provided by PPC on page 11 of its Responsive Claim Construction Brief.  *See* Doc. 74 at 11.  The Court finds it to be a useful visual representation of the difference between axial and radial directions (and, correspondingly, movement) in the context of the '416 Patent.

## II.    Prosecution History of the '416 Patent

The '416 Patent application was filed on February 18, 2004, and the Patent was issued on October 10, 2006.[28]  During the pendency of the application, the examiner initially rejected the application as "anticipated by" and "unpatentable over" prior art (namely prior art anticipated by or described in the Hung, Chen, Spinner, Szegda, and Siebelist patents).[29]  The examiner's grounds for this first rejection were based on 35 U.S.C. § 102(e) and 35 U.S.C. § 103(a).[30]  So the Court will take a moment to explain those provisions.

The pre-AIA version of 35 U.S.C. § 102(e) provides that an applicant is entitled to a patent unless

> the invention was described in (1) an application for patent . . . by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent . . . .[31]

And the pre-AIA version of 35 U.S.C. § 103(a) provides that

> [a] patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.[32]

---

[28] *See* Ex. A ('416 Patent) to Compl. (Doc. 1) at 10.

[29] Ex. A (Patent Prosecution History) to Def.'s Opening Claim Construction Br. (Doc. 71-1) at 158–61; *see also* U.S. Patent No. 6,767,248 (Hung); U.S. Patent No. 6,805,584 (Chen); U.S. Patent No. 5,059,139 (Spinner); U.S. Patent No. 3,678,446 (Siebelist).  It is unclear from the Patent's prosecution history which of several Szegda patents the examiner was referring to.  *Compare* Ex. A (Patent Prosecution History) to Def.'s Opening Claim Construction Br. (Doc. 71-1) at 160 (referencing a Szegda patent without indicating the patent number), *with id.* at 63–64 (showing the applicant's disclosure statement cited several Szegda patents).

[30] In 2011, Congress passed the Leahy-Smith America Invents Act (AIA), which amended 35 U.S.C. §§ 102 and 103. *SNIPR Techs. Ltd. v. Rockefeller Univ.*, 72 F.4th 1372, 1375–76 (Fed. Cir. 2023).  Because the '416 Patent was filed before March 16, 2013, it is governed by the pre-AIA versions of these statutes.  *See id.* at 1376.  Therefore, all references herein reflect the pre-AIA versions of the statutes at issue.

[31] 35 U.S.C. § 102(e).

[32] 35 U.S.C. § 103(a).

The examiner rejected three buckets of claims under these two statutory provisions: (1) claims 1, 3–4, 6–10, 12, 14–15, and 19 were rejected under § 102(e) as anticipated by Hung; (2) claims 2, 11, and 16 were rejected under § 103(a) as unpatentable over Hung in view of Chen; and (3) claims 5, 13, and 17–18 were rejected under § 103(a) as unpatentable over Hung in view of Spinner.[33] Essentially, the claims in the first bucket were rejected by the examiner for being previously disclosed by the Hung patent. And the claims in the second and third buckets were rejected by the examiner as being obvious combinations of previous patents—at least obvious to a person of ordinary skill in the subject matter of coaxial cable connectors.[34]

The applicant responded with a declaration (pursuant to 37 C.F.R. § 1.131) explaining that the date of invention relevant to the '416 Patent preceded the date the Hung patent was filed.[35] The applicant argued that this should remedy the § 102(e) and § 103(a) problems highlighted in the first rejection letter.[36] But the examiner again rejected all of the claims.[37] This time the rejection was on different grounds: (1) claims 1, 7–9, and 15 were rejected under § 102(b) as anticipated by Siebelist; (2) claims 1–4, 7–12, and 15–16 were rejected under § 103(a) as unpatentable over Chen in view of Siebelist; and (3) claims 5–6, 13–14, and 17–19 were rejected under § 103(a) as unpatentable over Chen in view of Siebelist and further in view of Spinner.[38]

---

[33] Ex. A (Patent Prosecution History) to Def.'s Opening Claim Construction Br. (Doc. 71-1) at 159–60.

[34] The "person having ordinary skill in the art to which said subject matter pertains" referenced in § 103(a) is a concept unique to patent law. It refers to a "fictitious individual presumed to have the same level of skill as the typical practitioner of the art at issue and is also presumed to be aware of all the pertinent prior art." 3 Robert A. Matthews, Jr., *Annotated Patent Digest* § 18.35 (Jan. 2025 Update); *see also id.* (quoting cases that discuss this concept at length).

[35] Ex. A (Patent Prosecution History) to Def.'s Opening Claim Construction Br. (Doc. 71-1) at 145–47; *see* 37 C.F.R. § 1.131(a) ("When any claim of an application . . . is rejected, the applicant . . . may submit an appropriate oath or declaration to establish invention of the subject matter of the rejected claim prior to the effective date of the reference . . . on which the rejection is based.").

[36] Ex. A (Patent Prosecution History) to Def.'s Opening Claim Construction Br. (Doc. 71-1) at 142.

[37] *See id.* at 127–29.

[38] *Id.*

The Court has already explained what a 103(a) rejection means.[39]  As to a rejection under § 102(b), it is of the same basic import as a rejection under § 102(e); in both circumstances, a claim is rejected for being previously disclosed by another patent.[40]

The applicant responded with a new declaration claiming an invention date preceding the filing date of the Chen patent.[41]  The applicant argued that this should remedy the § 103(a) issues related to the Chen patent described in the second rejection letter.[42]  Next, the applicant proposed several amendments to the claims.  All of these amendments were intended to distinguish the claimed invention from Siebelist by highlighting that Siebelist lacked the "equivalent element of a post" that "extend[s] within the inner bore to be radially inward of the elastomeric band."[43]

To that end, the applicant amended "the independent claims 1, 7, and 15 . . . to incorporate the limitation[s] of dependent claims 3, 4, 6, 10, 12, 14 and 19, respectively, that include the limitations that the post has a barbed portion and that, upon compression, the elastomeric band forms a seal radially outward of the barbed portion of the post."[44]  Those dependent claims, in turn, were cancelled.[45]

---

[39] *See supra* pp. 6–7.

[40] *See* 35 U.S.C. § 102(b) (explaining that an applicant is not entitled to a patent if "the invention was patented or described in a printed publication . . . more than one year prior to the date of the application for patent in the United States").

[41] *See* Ex. A (Patent Prosecution History) to Def.'s Opening Claim Construction Br. (Doc. 71-1) at 108–10.

[42] *Id.* at 106.

[43] *Id.*

[44] *Id.*  Looking at the similarities between dependent claims 3, 4, 6, 10, 12, 14, and 19, those limitations must have been created by the following phrase: "includ[ing] a barbed portion disposed where said band seals against said cable." *Id.* at 100–03.  For example, consider cancelled claim 4 ("A connector according to claim 1, wherein said post includes a barbed portion disposed where said band seals against said cable") and cancelled claim 10 ("A connector according to claim 9, wherein said receiving means includes a barbed portion disposed where said band seals against said cable"). *Id.* at 100–01.  The identicality of the language is clear, and the identicality holds for all of the other cancelled claims as well.

[45] *Id.* at 100–03.

The resulting amendments to independent claims 1, 7, and 15 are shown in bold below, with cancelled claim language struck through:

1. (Currently Amended) A connector for a coaxial cable, comprising:

a connector body;

a fastening member for connecting said connector to an object;

a post **including a barbed portion, said post** fitted at least partially inside said connector body for receiving a prepared end of said cable;

a compression member fitted to said connector body **radially outward of the barbed portion of the post**; and

an elastomeric band fitted inside a cavity formed at least in part by said compression member;

wherein axial movement of said compression member onto said connector body causes said elastomeric band to deform and seal an outer layer of said cable to said connector to isolate an inside of said connector from environmental influences.

***

7. (Currently Amended) A connector for a coaxial cable, comprising:

a connector body;

first connection means for connecting said connector to an object; and second connection means for connecting a prepared end of said cable to said connector;

wherein said second connection means includes **a post having a barbed portion,** an elastomeric band **radially outward of said barbed portion, said band forming a seal against** ~~for sealing~~ an outer layer of said cable ~~to said connector to isolate an inside of said connector from environmental influences~~.

***

15. (Currently Amended) A method of constructing a connector for a coaxial cable, comprising the steps of:

providing a connector body;

**fitting a metal post having a barbed portion at least partially inside said connector body,**

providing a fastening member for fastening said connector body to an object;

providing a compression member;

fitting an elastomeric band into a cavity formed at least in part by said compression member;

inserting a prepared end of said cable through said compression member and said elastomeric band; and

fitting said prepared cable end and said compression member to said connector body, wherein axial movement of said compression member onto said connector body causes said elastomeric band to deform and seal **against** an outer layer of said cable **radially outward of the barbed portion of the post** ~~to said connector to isolate an inside of said connector from environmental influences~~.[46]

In response to the applicant's new submission, the examiner issued a Notice of Allowance on June 5, 2006.[47]   The examiner concluded that the "applicant's invention combination[,] including[] '[a] post [with a] barbed portion, the post fitted at least partially inside the connector body for receiving a prepared [end] of the cable and [a] compression member fitted to the connector body radially outward of the [barbed] portion of the post'" was "not taught by Siebelist or suggested [by] other prior art of record."[48]   The U.S. Patent and Trademark Office issued the '416 Patent on October 10, 2006.[49]

---

[46] *Id.* at 100–103.  The numbering of an individual claim may change between the application(s) and the issued patent. In fact, that happened here.  The issued Patent renumbers the approved claims to eliminate gaps in numbering caused by things like claim cancellations.

[47] *Id.* at 89–91.

[48] *Id.* at 93.

[49] *Id.* at 42.

### III.    Legal History of the '416 Patent

Around 2010, PPC and PVM litigated several cases concerning PVM's alleged infringement of PPC's '416 Patent.[50]  Two of the cases were consolidated and proceeded in the District of Minnesota.[51]  Most relevant for our purposes, the district court in Minnesota denied PVM's Motion for Summary Judgment after rejecting PVM's proposed construction of the claim term "elastomeric band."[52]  Specifically, the district court explained that PVM's summary judgment "arguments of non-infringement no longer ha[d] merit as the Court [did] not adopt [PVM's] proposed construction of 'elastomeric band.'"[53]  Shortly after the denial of PVM's Motion for Summary Judgment, the parties settled by way of a sealed Confidential Settlement Agreement dated September 12, 2011.[54]

PPC asserts that, as a term of the sealed agreement, PVM promised to change its connector design and to stop infringing on the Patent.[55]  PPC further alleges that PVM broke that promise and is actively infringing on the Patent.[56]  Specifically, PPC alleges that (1) PVM "is making,

---

[50] *See John Mezzalingua Assocs., Inc. v. Perfect 10 Antenna Co.*, No. 5:09-cv-1375-GTS-GHL (N.D.N.Y. filed Dec. 12, 2009); *Perfect 10 Antenna Co. v. John Mezzalingua Assocs., Inc*, No. 4:09-cv-00939-SWW (E.D. Ark. filed Dec. 16, 2009); *John Mezzalingua Assocs., Inc. v. Pace Elecs., Inc.*, No. 0:10-cv-00064-MJD-JJG (D. Minn. filed Jan. 7, 2010); *John Mezzalingua Assocs., Inc. v. Perfect 10 Antenna Co.*, No. 0:10-cv-00781-MJD-JJG (D. Minn. filed Mar. 12, 2010).  PVM was formerly known as the Perfect 10 Antenna Company as reflected in the earlier litigation concerning the '416 Patent.  *See* Pl.'s Opening Claim Construction Br. (Doc. 72) at 7 n.1.  PPC was formerly known as John Mezzalingua Associates, Inc.  *See* Order at 3–4 n.19, *PPC Broadband, Inc. v. PerfectVision Mfg., Inc.*, No. 4:22-cv-00163-LPR (E.D. Ark. Dec. 10, 2024), ECF No. 57.

[51] After consolidation, the Minnesota case proceeded as *John Mezzalingua Assocs., Inc. v. Pace Elecs., Inc.*, No. 0:10-cv-00064-MJD-JJG (D. Minn.).  *See* Consolidation Order, *John Mezzalingua Assocs., Inc. v. Pace Elecs., Inc.*, No. 0:10-cv-00064-MJD-JJG (D. Minn. Mar. 18, 2010), ECF No. 52.

[52] *See* Order at 7–13, *John Mezzalingua Assocs., Inc. v. Pace Elecs., Inc.*, No. 0:10-cv-00064-MJD-JJG (D. Minn. July 22, 2011), ECF No. 159.

[53] *Id.* at 13.

[54] *See* Ex. 1 (Sealed Confidential Settlement Agreement) to Sealed Answer (Doc. 22-1).

[55] *See* Pl.'s Opening Claim Construction Br. (Doc. 72) at 7.

[56] *Id.* ("Less than two months after [the Minnesota court's] decision, the parties settled their dispute, with PVM promising that it would change its connector design and stop infringing the '416 Patent. . . . How long, if at all, PVM kept that promise is unclear.  What is clear is that PVM is once again infringing the '416 Patent.").

using, offering to sell, selling, and/or importing connectors that infringe one or more claims in the '416 Patent" under the trade names "SignaLoc" and "RidgeLoc," and (2) PVM possesses "full knowledge of both the '416 Patent and [PVM's] earlier failed attempt to use claim construction to avoid PPC's claims of infringement."[57]  PVM disagrees.[58]  Hence, the instant lawsuit.[59]

Pending before the Court are the parties' dueling constructions of claim terms.[60]  The parties have identified nine disputed terms for the Court to resolve.[61]

## DISCUSSION

Whether PVM is liable for patent infringement is a question of fact.[62]  That means a jury is responsible for deciding whether PVM's creation and sale of "SignaLoc" and "RidgeLoc" coaxial cable connectors is unlawful because those connectors fall within the scope of the '416 Patent.  To determine whether a product is covered by a patent claim, a jury must first know what the words of that patent claim mean.  And parties to a patent-infringement suit rarely agree on the meaning of a patent claim.  The Supreme Court, in *Markman v. Westview Instruments, Inc.*, held that judges, not juries, are responsible for resolving disputes as to the meaning of a patent claim.[63]

---

[57] Compl. (Doc. 1) ¶¶ 3, 14.

[58] *See* Def.'s Redacted Answer (Doc. 16) ¶¶ 3, 14, 28 ("PerfectVision denies each and every allegation contained in Plaintiff's Prayer for Relief and further denies that PPC is entitled to any of the requested relief.").  PVM also offers five affirmative defenses.  *See id.* ¶¶ 29–33.

[59] On September 9, 2022, PVM submitted a (non-confidential) Petition for *inter partes* review of the Patent.  *See* Doc. 28-1.  The instant case was stayed pending the outcome of that Petition.  *See* Order Staying Case (Doc. 39).  The Petition was eventually denied on timeliness grounds.  *See* Ex. A (Decision Denying *Inter Partes* Review) to Supp. Joint Report (Doc. 44) at 8 ("Upon considering the evidence presented and the arguments made, we do not institute an *inter partes* review because the Petition was not filed within the one-year period set forth in 35 U.S.C. § 315(b).").  And the stay was then lifted.  *See* Order Lifting Stay (Doc. 57).

[60] PVM does not appear to be attempting to revisit the claim construction issue that it lost in the related Minnesota case.  Rather, the parties have identified other claim terms in the '416 Patent for the Court to construe.  *See* Joint Claim Chart (Doc. 63).

[61] *See id.*

[62] *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 849 (Fed. Cir. 2010).

[63] 517 U.S. at 372.

A judge resolves such disputes through claim construction.[64]  The judge's constructions are the foundation for the jury instructions that will be used to determine whether, as a matter of fact, infringement has occurred.[65]

The Court's job at the claim-construction stage is to discern the "ordinary meaning" of the disputed patent claims.[66]  "Ordinary meaning" is a phrase that frequently appears in caselaw.  It is most often invoked by courts when interpreting a statute.[67]  In that context, a term's "ordinary meaning" is the meaning that a regular member of the public would have given that term when the statute was adopted.[68]  The claim construction analysis is similar, but with a very important twist. Here, "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention . . . ."[69]

Claim construction begins, of course, with the words of the claim.  These words define "the bounds of claim scope."[70]  But they cannot be read in isolation.  "The words used in the claims are interpreted in light of the intrinsic evidence of record, including the written description, the drawings, and the prosecution history, if in evidence."[71]  Other than the actual words of the claims themselves, this intrinsic evidence is "the most significant source of the legally operative meaning

---

[64] *See id.* at 388–90.

[65] *See Kaufman v. Microsoft Corp.*, 34 F.4th 1360, 1370 (Fed. Cir. 2022) ("A proper claim construction provides a legal standard for the jury to apply . . . .").

[66] *See Sound View Innovations, LLC v. Hulu, LLC*, 33 F.4th 1326, 1332 (Fed. Cir. 2022).

[67] *See, e.g.*, *Niz-Chavez v. Garland*, 593 U.S. 155, 160 (2021) ("When called on to resolve a dispute over a statute's meaning, this Court normally seeks to afford the law's terms their ordinary meaning at the time Congress adopted them.").

[68] *Cf. Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 277–78 (2018).

[69] *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005); *see also Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 330 (2015) ("Statutes, in general, address themselves to the general public; patent claims concern a small portion of that public.").

[70] *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002).

[71] *Id.*

of disputed claim language."[72]  In construing a claim, courts "indulge a heavy presumption that a claim term carries its ordinary and customary meaning" determined by a review of "a variety of sources, including the claims themselves" and "other intrinsic evidence including the written description and the prosecution history . . . ."[73]

There is a hierarchy of intrinsic evidence—with the specification at the top of the list.  This is because the claims "are part of a fully integrated written instrument, consisting principally of a specification that concludes with the claims."[74]  Accordingly, "the person of ordinary skill in the art is deemed to read the claim term . . . in the context of the entire patent, including the specification."[75]  And "[t]he specification may assist in resolving ambiguity where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone."[76]  In short, because the specification, through embodiments and experiments, provides the strongest evidence of how the patentee viewed the invention, it is generally considered "the single best guide to the meaning of a disputed term."[77]

---

[72] *Id.* at 1325 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

[73] *Id.* (internal quotations and citations omitted).

[74] *Phillips*, 415 F.3d at 1315 (internal quotations and citation omitted).

[75] *Id.* at 1313.

[76] *Teleflex, Inc.*, 299 F.3d at 1325.

[77] *Phillips*, 415 F.3d at 1315 (quoting *Vitronics*, 90 F.3d at 1582).  It is very important to remember that, although "the claims must be read in view of the specification, . . . limitations from the specification are not to be read into the claims."  *Teleflex, Inc.*, 299 F.3d at 1326 (internal citations omitted).  Using the specification to read limitations into claims where the claim language does not suggest or support such limitations is one of the cardinal sins of claim construction.  *See id.* at 1324.  That is because the actual words of the claims at issue are the north star of claim construction.  *See Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997) ("[T]he language of the claim frames and ultimately resolves all issues of claim interpretation."); *see also Reinshaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) ("[T]he claims define the scope of the right to exclude; the claim construction inquiry, therefore, begins and ends in all cases with the actual words of the claim . . . .").

Prosecution history also "plays various roles in resolving uncertainties about claim scope."[78]  For one example, in limited circumstances, the prosecution history can reveal that a claim's scope is "narrower than it would otherwise be."[79]  This narrowing is generally the result of a "prosecution history disclaimer."[80]  A disclaimer occurs "when the patentee unequivocally and unambiguously disavows a certain meaning to obtain a patent . . . ."[81]  There's a high bar to establishing a disclaimer:  The "disavowing actions or statements made during prosecution [must] be both clear and unmistakable."[82]  But if that high bar is cleared, then the patentee is precluded "from recapturing through claim interpretation specific meanings disclaimed during prosecution."[83]

Intrinsic evidence is usually sufficient to arrive at the proper construction of a patent claim.[84]  There are times, however, where, after reviewing all of the intrinsic evidence, ambiguities in the meaning of a claim term remain.  In those situations, courts may turn to "extrinsic evidence," which is "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises."[85]  But as this Court previously cautioned in *Enviro Tech Chemical Services, Inc. v. Safe Foods Corporation*,

---

[78] *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1358–59 (Fed. Cir. 2017) (quoting *SAS Inst., Inc. v. ComplementSoft, LLC.*, 825 F.3d 1341, 1349 (Fed. Cir. 2016)).

[79] *Phillips*, 415 F.3d at 1317.

[80] *Baxalta Inc. v. Genentech, Inc.*, 972 F.3d 1341, 1348 (Fed. Cir. 2020).

[81] *Aylus Networks*, 856 F.3d at 1359 (quoting *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013)).

[82] *Id.* at 1359 (quoting *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1326 (Fed. Cir. 2003)).

[83] *Id.* (quoting *Omega Eng'g*, 334 F.3d at 1323).  This is not the only way in which the prosecution history can be used.  For another example, the prosecution history can "confirm the way in which a patent was understood by the patentee and PTO, which in turn sheds light on how the patent would be read by a person of ordinary skill in the art."  Claim Construction Order at 10–11, *PPC Broadband, Inc. v. PerfectVision Mfg., Inc.*, No. 4:22-cv-00163-LPR (E.D. Ark. Aug. 2, 2024), ECF No. 49 (citing *Phillips*, 415 F.3d at 1317).

[84] *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 705–06 (Fed. Cir. 1997).

[85] *Phillips*, 415 F.3d at 1317 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995)).  Sometimes, even when "viewed in light of the specification and prosecution history," and even after all intrinsic and

When possible, it's best to avoid extrinsic evidence. It is just as likely to complicate as it is to clarify. There are often fights about which extrinsic sources are worthy of consideration and exactly how the chosen sources should be applied to the terms at issue. Moreover, using extrinsic evidence muddies the waters as to whether a judge is weighing evidence and factfinding or performing the legal function of interpreting a document. The point here is that extrinsic evidence comes inside a break-glass-in-case-of-emergency package with a use-with-extreme-care warning label.[86]

With the foregoing principles in mind, we now turn to the nine disputed terms in the '416 Patent claims. The Court addresses the terms in the same order that they were presented in the Joint Claim Chart and the parties' briefing.

## I. Disputed Term #1

The parties first dispute portions of claim 1. The parties set out the disputed portions as follows:

> "a compression member fitted to said connector body radially outward of the barbed portion of the post; and an elastomeric band fitted inside a cavity formed at least in part by said compression member"

> a compression member fitted to said connector body "radially outward of the barbed portion of the post"[87]

---

[86] No. 4:21-CV-00601-LPR, 2022 WL 17721179, at *5 (E.D. Ark. Dec. 15, 2022). *See also Teva Pharms.*, 574 U.S. at 331–32 (holding that a court's analysis of intrinsic evidence is "a determination of law," while analysis of extrinsic evidence requires "subsidiary factual findings"). The Court has not used extrinsic evidence in construing the disputed claim terms in today's Order. The Court did, however, rely on extrinsic evidence in the Background Section of this Order to generally explain the technical meanings of concepts like creep, resilience, and compression set—words that appear in the '416 Patent's specification (but not in the claims). Those words were not defined or explained in the intrinsic evidence and were not readily understandable without resort to academic or industry sources. If any party (1) objects to the Court's definition of any of these words, and (2) believes something turns on that definition or those definitions, such party may file a Rule 60 Motion explaining its position.

extrinsic evidence is considered, a patent claim fails to "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). In that case, the claim is "indefinite" and is invalidated. *See id.* at 909–10. The indefiniteness inquiry begins with the same general mode of analysis as just described for claim construction purposes. *See Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1349 (Fed. Cir. 2022); *see also HZNP Meds. LLC v. Actavis Laboratories UT, Inc.*, 940 F.3d 680, 688 (Fed. Cir. 2019). The burden of proof is on the party challenging patent validity on indefiniteness grounds. *Bosch Auto. Serv. Sols., LLC v. Matal*, 878 F.3d 1027, 1040 (Fed. Cir. 2017). No party suggests any of the disputed claims at issue in this case are indefinite.

[87] Joint Claim Chart (Doc. 63) at 2.

The parties agree that the claim language must be interpreted to require a particular relationship between the elastomeric band and the barbed portion of the post when the connector is in the compressed (or closed) state.[88]  They are correct.  They are also correct in their agreement concerning the importance of the prosecution history to the construction of the claim term.[89]

Both parties propose constructions that primarily rely upon the prosecution history.  This makes sense because we are dealing with what both parties agree amounts to a disclaimer.[90]  And the Federal Circuit teaches that, when a patent applicant amends a patent's claims in order to gain allowance of those claims, a court tasked with construing those claims must "give [the additional phrases] weight, for the patentability of the claims hinged upon their presence in the claim language."[91]  Similarly, as the Supreme Court has instructed:

> The applicant having limited his claim by amendment and accepted a patent, brings himself within the rules that if the claim to a combination be restricted to specified elements, all must be regarded as material, and that limitations imposed by the inventor, especially such as were introduced into an application after it had been persistently rejected, must be strictly construed against the inventor and looked upon as disclaimers.[92]

Despite the parties' agreement regarding disclaimer, they nevertheless disagree about the proper construction to use.  PPC bases its proposed construction on the patent applicant's express

---

[88] *See* Pl.'s Resp. Claim Construction Br. (Doc. 74) at 9; Def.'s Resp. Claim Construction Br. (Doc. 73) at 5–6.

[89] *See* Oct. 16, 2023 Markman Hr'g Tr. (Rough) at 16–17 ("Usually parties are fighting about whether or not it was or was not a disclaimer.  The parties agree.  They disagree on how to describe the disclaimer.  The defendant would like to define this limitation using words that were in the dependent claim—the pending dependent claims that were cancelled. . . .  Where the parties diverge on this term is that we think [the Court] ought to construe the term to mean exactly what the inventor says it means."); *see also id.* at 19 ("Everyone agrees that what the inventor said to the patent office is correct.  No one is disputing that it's incorrect. . . .  The only question is, is the way they're trying to then rewrite that phrase, does that mean the same thing [as] disposed where the band forms a seal?  Does that mean the same thing as directly above or radially outward?").

[90] *See id.* at 16, 25.

[91] *See Jansen v. Rexall Sundown, Inc.*, 342 F.3d 1329, 1333–34 (Fed. Cir. 2003) (citing *Smith v. Magic City Kennel Club, Inc.*, 282 U.S. 784, 790 (1931)).

[92] *Magic City Kennel Club*, 282 U.S. at 790.

remarks (and actual amendments made) during prosecution to overcome the examiner's prior art rejection.[93]  The applicant's remarks clarified that claim 1 and the other independent claims, as amended, include the limitation that "upon compression, the elastomeric band forms a seal radially outward of the barbed portion of the post."[94]  PPC's proposed construction adopts this language wholesale from the applicant's remarks.

On the other side of the proverbial aisle, PVM bases its preferred construction on the language from certain cancelled dependent claims.  Each of the relevant cancelled claims used the following language to describe the connector's post: "includes a barbed portion disposed where said band seals against said cable."[95]  PVM reasons that, because the applicant represented that the independent claims were "amended to incorporate the limitation" of the relevant cancelled dependent claims, the amended independent claims must require that the barbed portion of the post be "disposed where said band seals against said cable" in the compressed state.[96]  PVM argues that its construction more "precisely captures the structural arrangement between the band and the barbed portion of the post that the specification requires" and is more "easily understandable to a lay juror" than PPC's construction.[97]

Still, PVM concedes that the proposed constructions of both parties "have the same meaning" and that PPC's construction "is simply another way of explaining PVM's proposed

---

[93] *See* Pl.'s Opening Claim Construction Br. (Doc. 72) at 17–19.

[94] *See id.* at 17.

[95] *See* Def.'s Opening Claim Construction Br. (Doc. 71) at 16; Ex. A (Patent Prosecution History) to Def.'s Opening Claim Construction Br. (Doc. 71-1) at 100–03.

[96] *See* Def.'s Opening Claim Construction Br. (Doc. 71) at 16.

[97] *See id.* at 19.

construction."[98]  Indeed, PVM even represented that it was "amenable to the Court adopting PPC's proposed construction, so long as the Court further explains that the construction requires the barbed portion of the post to be disposed where the elastomeric band seals against the cable."[99] Accordingly, the Court really need only decide which proposed construction is more appropriate for the jury to understand the claim term.

On that front, PPC says that, among other things, PVM's construction "injects unnecessary ambiguity and confusion into the meaning of the claim."[100]  PPC says that its own definition, on the other hand,

> obviates such ambiguity and confusion by making it clear that such claim language means that, upon compression resulting from the axial movement of the compression member, the elastomeric band forms a seal radially outward of the barbed portion of the post, in accordance with how one of ordinary skill would understand such claim language read in context.[101]

All in all, the Court is persuaded to adopt PPC's construction.  Here's why.

The prosecution history supports PPC's position.  In response to the examiner's rejection,

> [The applicant] amended claim 1 to include "a barbed portion" and to require that the compression member is fitted to the connector body "radially outward of the barbed portion of the post" so as to make it clear that upon compression, the elastomeric band forms a seal radially outward of the barbed portion of the post.[102]

The applicant explained to the examiner that these limitations to claim 1 were "intended to distinguish the invention over the prior art by requiring that 'the post has a barbed portion and that,

---

[98] *Id.* at 18–19.  At the hearing, some wrinkles arose that suggested the parties' competing constructions might not be as synonymous as PVM initially asserted.  *See* Oct. 16, 2023 Markman Hr'g Tr. (Rough) at 20–21, 26–27. Nonetheless, the point here is that PVM does not argue that PPC's construction is inaccurate.

[99] Def.'s Opening Claim Construction Br. (Doc. 71) at 19.

[100] *See* Pl.'s Opening Claim Construction Br. (Doc. 72) at 17.

[101] *Id.*

[102] *Id*; *see also* Ex. A (Patent Prosecution History) to Def.'s Opening Claim Construction Br. (Doc. 71-1) at 100.

___***upon compression***___**, the elastomeric band forms a seal radially outward of the barbed portion of**

___**the post.***___**'"**[103]   Because the prior art lacked this feature, the examiner allowed the claims and the

U.S. Patent and Trademark Office issued the Patent.[104]  In light of the caselaw previously cited,[105]

this Court should use the applicant's express explanatory remarks regarding the amended claim

language—given the prosecution history and the fact that the amended language served to

sufficiently distinguish the Patent from prior art such that the Patent was issued.

Of course, PVM's position is based on more than just the Patent's prosecution history.  At

the Markman Hearing, PVM emphasized what it saw as a lack of clarity in PPC's proposed

construction.[106]  First, PVM took issue with PPC's use of the phrase "upon compression" to

identify when the elastomeric band is to form a seal radially outward of the barbed portion of the

post.[107]  PVM asserted that the phrase "after compression" would be better, because (according to

PVM) that phrase more clearly evoked the idea of the elastomeric band being in a fully compressed

state when it forms a seal radially outward of the barbed portion of the post.[108]  Second, PVM took

issue with PPC's use of the phrase "radially outward."[109]  PVM asserted that "[i]f radially could

allow for something radiating so that it's offset, that would be a problem" because the elastomeric

band must be positioned "directly up and down, directly above" the barbed post when

---

[103] Pl.'s Opening Claim Construction Br. (Doc. 72) at 17; *see also* Ex. A (Patent Prosecution History) to Def.'s Opening Claim Construction Br. (Doc. 71-1) at 106.

[104] *See* Pl.'s Opening Claim Construction Br. (Doc. 72) at 17–18; *see also* Ex. A (Patent Prosecution History) to Def.'s Opening Claim Construction Br. (Doc. 71-1) at 93.

[105] *See supra* p. 17.

[106] *See* Oct. 16, 2023 Markman Hr'g Tr. (Rough) at 26–27.

[107] *See id.* at 26.

[108] *See id.*

[109] *See id.* at 26–27.

compressed.[110]  For the sake of clarity, PVM suggested that combining the parties' constructions would "best . . . describe the concept that the band must be directly above the post and creating the mechanical interlock in that compressed state."[111]

The Court disagrees.  Regarding PVM's first concern, PPC's "upon compression" language more clearly indicates that the thing being tested is in a compressed state than does PVM's "after compression" language.  "Upon compression" better indicates that compression is presently happening.  "After compression" leaves open the possibility that compression has ceased. Regarding PVM's second concern, the Court is satisfied that lay jurors will be able to understand (especially with the help of visual aids) "radially outward" such that they will understand that the elastomeric band has to be positioned on top of (or—third-dimensionally speaking—outside of) the barb when compressed.  Moreover, introducing language that suggests perfect perpendicularity is necessary may actually serve to confuse lay jurors about the scope of the claim.

For the foregoing reasons, the Court will construe the claim term as follows:  "the post has a barbed portion and, upon compression, the elastomeric band forms a seal radially outward of the barbed portion of the post."

## II.    Disputed Term #2

The second dispute concerns portions of claim 4.  The parties set out the disputed portions as follows:

"first connection means"

---

[110] *Id.* at 26.  PVM also cautions that PPC's use of the phrase "radially outward"—without further explanation—"is not easily understandable to a lay juror" and therefore "could be misunderstood or misapplied." Def.'s Opening Claim Construction Br. (Doc. 71) at 19.  But PVM's preferred construction uses the same phrase. *Id.* at 15.  And PPC correctly points out that the parties did agree to the use of the phrase "the radial direction of the connector" in the construction of the term "elastomeric band" without requiring further definition. *See* Pl.'s Resp. Claim Construction Br. (Doc. 74) at 10.

[111] *Id.* at 27.

"first connection means for connecting said connector to an object"[112]

The parties agree that claim 4 is written in a means-plus-function limitation format.[113] The interpretation of a means-plus-function limitation is governed by 35 U.S.C. § 112(f):

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.[114]

A means-plus-function limitation allows a patentee to "generically define a structure for performing a particular function through the use of a means expression" as opposed to "specifically describing the structures of his invention" as he would do in a standard patent limitation.[115] The range of different structures that a means-plus-function limitation will cover is determined by the specification—specifically, the written description of the invention.[116]

The Federal Circuit has set out a two-step approach for construing a means-plus-function limitation.[117] "First, we determine the claimed function. Second, we identify the corresponding structure in the written description that performs that function."[118]

The parties appear to agree that the claimed function should be construed as "connecting the connector to an object, such as a port."[119] So, with the construction of the function settled, the

---

[112] Joint Claim Chart (Doc. 63) at 2.

[113] *See* Pl.'s Resp. Claim Construction Br. (Doc. 74) at 11; Def.'s Resp. Claim Construction Br. (Doc. 73) at 8.

[114] 35 U.S.C. § 112(f). Pre-AIA, the operative provision was 35 U.S.C. § 112, ¶ 6. The language of the pre-AIA provision is identical to that of the post-AIA provision.

[115] D. Joshua Smith, *Arguing Application of the Means-Plus-Function Limitation to Claim Elements Without Traditional "Means" Language*, 3 CHI-KENT J. INTELL. PROP. 2 (2004).

[116] Yoncha Lynn Kundupoglu, *The Law of Means-Plus-Function Language (Part I of II)*, 28 AIPLA Q.J. 39, 42 (2000).

[117] *See JVW Enters., Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1330 (Fed. Cir. 2005).

[118] *Id.* (citation omitted).

[119] With respect to the claimed function, in the parties' briefing, there was one notable disagreement and one minor disagreement. Let's start with the notable disagreement. PPC wanted to add "and/or fastening" to the mix. Pl.'s Opening Claim Construction Br. (Doc. 72) at 19. PVM disagreed. Def.'s Opening Claim Construction Br. (Doc. 71) at 20. The Court need not resolve that disagreement because, at the Markman Hearing, PPC agreed to drop its request for the "and/or fastening" language. *See* Oct. 16, 2023 Markman Hr'g Tr. (Rough) at 31. As for the minor

Court will move on to Step Two of the analysis. The Step Two analysis begins with "look[ing] to the written description to identify the structure corresponding to that function."[120] The parties agree that the written description indicates that the claimed structure used to perform the claimed function is a "nut."[121] What is disputed, however, is the degree of specificity that this Court should adopt in its construction of the claimed structure.

PPC's proposed construction identifies the structure as a "nut" and then points to the nuts in specific embodiments in the specification.[122] To be clear, that portion of PPC's proposed construction reads as follows: "a nut such as nut 12, nut 12', and nut 44 as show[n] in Figures 1–7 (and related description in the specification) and equivalents thereof."[123] In contrast, PVM's construction simply identifies the structure as a "[n]ut and equivalents thereof."[124] PVM characterizes PPC's proposed definition of nut—specifically the reliance on the nuts depicted in Figures 1–7 (and identified by the numbers 12, 12', and 44 in those Figures)—as creating unnecessary ambiguity and thus inviting unnecessary trial disputes.[125] PVM's point seems to be that a nut is a nut is a nut; therefore, nothing is gained from referring to the various embodiments, but the Court's reliance on the specification's depictions of a nut (as opposed to a definition of a nut) will confuse jurors.

---

disagreement, there was a divergence as to whether the claimed function should include the language "such as a port" or include more specific language like "such as an equipment port, an F-port, or other connector." *See* Joint Claim Chart (Doc. 63) at 2. At the Markman Hearing, PVM conceded that this disagreement was "not important" and that the Court could use PPC's preferred language of "such as a port." Oct. 16, 2023 Markman Hr'g Tr. (Rough) at 40.

[120] *See Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999).

[121] *See* Joint Claim Chart (Doc. 63) at 2.

[122] *Id.*

[123] *Id.*

[124] *Id.*

[125] *See* Def.'s Opening Claim Construction Br. (Doc. 71) at 22; Def.'s Resp. Claim Construction Br. (Doc. 73) at 9.

The Federal Circuit has instructed that "[i]dentification of corresponding structure may embrace more than the preferred embodiment.  A means-plus-function claim encompasses all structure in the specification corresponding to that element and equivalent structures."[126]  And "[w]hen multiple embodiments in the specification correspond to the claimed function, proper application of [§ 112(f)] generally reads the claim element to embrace each of those embodiments."[127]  Further, when "alternative structures corresponding to [a] claimed function [are] described," a district court must not read the claim as limited only "to the specific structures of the preferred embodiment."[128]  These teachings do not exclude either PVM's or PPC's position as a matter of law.  To be clear, then, PPC's inclusion of the various depictions of a nut in the specific embodiments of the specification is legally permissible.  And the Court prefers it.

The Court does not see how PPC's preferred construction would cause any juror confusion or otherwise introduce ambiguity.  True, PPC's proposed construction does not define a nut.  But neither does PVM's proposed construction.  If anything, PPC's more specific construction actually reduces ambiguity compared to PVM's proposed construction.  That is because, as PPC says, the construction "allows the Court and the jury to reference the complete description and depiction of nut 12, nut 12' and nut 44 contained in the specification."[129]  This will—at least slightly—aid the jury's understanding of what a nut is.  PVM's risk-of-ambiguity arguments are not persuasive.[130]

---

[126] *Micro Chem.*, 194 F.3d at 1258.

[127] *Id.* (citing *Serrano v. Telular Corp.*, 111 F.3d 1578, 1583 (Fed. Cir. 1997)).

[128] *Id.* at 1259.

[129] Pl.'s Resp. Claim Construction Br. (Doc. 74) at 12.

[130] PVM argues that the specification only describes a "nut" as the structure for fulfilling the function of connecting the connector to an object.  Def.'s Resp. Claim Construction Br. (Doc. 73) at 9.  Therefore, according to PVM, there are no "alternative structures" to justify a construction that goes beyond a simple "nut."  *Id.*  But, even assuming PVM is correct on this point, reference to the Figures will be more clarifying than confusing to the jury with respect to explaining what a nut is.

For the foregoing reasons, the Court will construe the claim term as follows:  "<u>Function</u>: connecting the connector to an object, such as a port; <u>Structure</u>: a nut such as nut 12, nut 12' and nut 44 as shown in Figures 1–7 (and related description in the specification) and equivalents thereof."

### III.    Disputed Term #3

The third dispute concerns portions of claims 4 and 5.  The parties set out the disputed portions as follows:

"second connection means"

"second connection means for connecting a prepared end of said cable to said connector"[131]

As was true in Dispute #2 above, the parties agree that this term is a means-plus-function limitation.[132]  But unlike Dispute #2 above, the Court is not so sure that the parties are right.  To understand why, we must look at the full language of claims 4 and 5.  Claim 4 reads:

A connector for a coaxial cable, comprising: a connector body;

first connection means for connecting said connector to an object; and

second connection means for connecting a prepared end of said cable to said connector;

wherein said second connection means includes a post having a barbed portion, an elastomeric band radially outward of said barbed portion, said band forming a seal against an outer layer of said cable.[133]

Claim 5 reads:

A connector according to claim 4, wherein said second connection means includes means for axially moving a compression member onto said connector body, and

---

[131] Joint Claim Chart (Doc. 63) at 2–3.

[132] Def.'s Opening Claim Construction Br. (Doc. 71) at 24; Pl.'s Opening Claim Construction Br. (Doc. 72) at 21.

[133] Ex. A ('416 Patent) to Compl. (Doc. 1) at 21, col. 5 ll. 13–22.

said elastomeric band is fitted inside a cavity formed at least in part by said compression member.[134]

It is true that, for both claims, the claim language includes the word "means."  It is also true that the claim language connects the means to a recited function.  So far, so good for the parties' joint understanding that this is a means-plus-function limitation.

But here's the potential snag.  Under binding Federal Circuit precedent, "even if the claim element specifies a function, if it also recites sufficient structure or material for performing that function, [§ 112(f)] does not apply."[135]  And claim 4's last claim element seems to include a significant structural component.  The Court wonders whether this last claim element sets out "sufficient structure or material for performing" the recited function such that the disputed language in claim 4 is not a means-plus-function limitation.[136]  Specifically, does claim 4 "recite[] a function, but then go[] on to elaborate sufficient structure, material, or acts within the claim itself to perform entirely the recited function[?]"[137]

Neither party raised this issue.  So the Court will provide each party the opportunity to submit a supplemental brief (of no more than 10 pages) addressing (1) the Court's substantive legal concern just stated above and (2) whether the Court can/should raise an issue like this *sua sponte*.  Briefs will be due 21 days from the date of this Order.  The Court will not construe the disputed claim language until after it receives and reviews the supplemental briefing.

---

[134] *Id.* at 21, col. 5 ll. 23–27.

[135] *Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1302 (Fed. Cir. 1999).

[136] *See id.*

[137] *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1427–28 (Fed. Cir. 1997).  If the disputed claim language turns out not to be a means-plus-function limitation with respect to claim 4, the Court will also want to know what that means for the disputed claim language with respect to claim 5.

## IV.    Disputed Term #4

The fourth disputed term concerns claim 5.  The disputed claim language is "means for axially moving a compression member onto said connector body."[138]  The parties agree that this term recites a means-plus-function limitation.[139]  The parties also agree that the function of the "means for axially moving a compression member onto said connector body" is axially moving a compression member onto a connector body.[140]  Furthermore, the parties generally appear to agree that the structure disclosed in the specification that performs this function consists of threads or a sleeve on the compression member.[141]

But there are (relatively small) disputes here concerning the structural component of the dueling proposed constructions.  PPC's proposed structure-related construction is:  "threads and/or a sleeve as shown in Figures 1–7 (and related description in the specification) and equivalents thereof."[142]  PVM's proposed structure-related construction is:  "[a] plurality of threads on a compression nut engaging a plurality of threads on a connector body, and equivalents thereof, [or a] sleeve on a compression fitting engaging a portion of the connector body, and equivalents thereof."[143]

---

[138] Joint Claim Chart (Doc. 63) at 4.

[139] Def.'s Opening Claim Construction Br. (Doc. 71) at 29; Pl.'s Opening Claim Construction Br. (Doc. 72) at 24. Notwithstanding what the Court asks about claim 5 in footnote 137 above, the Court will assume for now the parties are correct on this point with respect to the instant disputed language.

[140] Joint Claim Chart (Doc. 63) at 4.

[141] *See id.*

[142] *Id.*

[143] *Id.*

PVM objects to PPC's proposed use of "and/or" in the proposed phrase "threads and/or a sleeve."[144]  But the Court will not spill ink on this one—because "PPC has no objection if the Court uses 'or' instead of 'and/or.'"[145]  So we move on to the next small dispute.

PPC objects to PVM's proposed use of "plurality" in the phrase "[a] plurality of threads" as redundant and unnecessary.[146]  PPC's point appears to be that (1) the use of the plural "threads" already implies more than one thread, and (2) the word "plurality" simply means more than one. At the Markman Hearing, although PVM maintained that "plurality" should be included because that term is in the language of the specification, PVM indicated it was comfortable with proceeding with a definition that did not include the word "plurality."[147]  So the Court sees no good reason to include the "plurality" language in the construction.

There is one final difference between the parties' constructions of this disputed term.  PPC wishes to include the language "as shown in Figures 1–7 (and related description in the specification)."[148]  PVM's objection to this language is largely the same as PVM's earlier objection to similar references in PPC's proposed construction of Disputed Term #2.[149]  The Court adopts PPC's proposed construction on this point, for the same reasons the Court did so with respect to Disputed Term #2.[150]  PPC's proposed construction (including the references) is more likely to reduce ambiguity than it is to create ambiguity.[151]

---

[144] Def.'s Opening Claim Construction Br. (Doc. 71) at 30.

[145] Pl.'s Resp. Claim Construction Br. (Doc. 74) at 18; *see also* Oct. 16, 2023 Markman Hr'g Tr. (Rough) at 73–74.

[146] Pl.'s Resp. Claim Construction Br. (Doc. 74) at 19.  The Court notes that PPC has "no objection to requiring that, in the case of threads, threads on a compression member engage threads on a body, or, in the case [of] a sleeve, the sleeve engages a portion of the body."  *Id.*

[147] Oct. 16, 2023 Markman Hr'g Tr. (Rough) at 74–75.

[148] Joint Claim Chart (Doc. 63) at 4.

[149] *Compare* Def.'s Opening Claim Construction Br. (Doc. 71) at 29–30, *with id.* at 22.

[150] *See supra* pp. 23–24.

[151] *See id.*

For the foregoing reasons, the Court will construe the claim term as follows:  "<u>Function</u>: axially moving a compression member onto a connector body; <u>Structure</u>: threads on a compression nut engaging threads on a connector body as shown in Figures 1–7 (and the related description in the specification) and equivalents thereof, or a sleeve on a compression fitting engaging a portion of the connector body as shown in Figures 1–7 (and the related description in the specification) and equivalents thereof."

## V.    Disputed Claim Term #5

The fifth term at issue appears across three claims in slightly different forms.[152]  In claim 1, the relevant language reads:  "a post including a barbed portion."[153]  In claim 4, the relevant language reads:  "a post having a barbed portion."[154]  In claim 8, the relevant language reads: "a metal post having a barbed portion."[155]

PVM advances a pretty generic construction of this term.  Namely, PVM's proposed construction would explain simply that "[a] barbed portion" means "a portion of the post with a raised profile."[156]  PPC, on the other hand, proposes a more detailed construction: "the post has a barbed portion, which is a raised edge that projects radially outward from the tubular portion of the post so as to form a mechanical interlock with the cable when the elastomeric band is compressed radially outward of the barbed portion and squeezed inward onto the cable."[157]

---

[152] Joint Claim Chart (Doc. 63) at 4.

[153] *Id.*; Ex. A ('416 Patent) to Compl. (Doc. 1) at 20, col. 4 l. 61.

[154] Joint Claim Chart (Doc. 63) at 4; Ex. A ('416 Patent) to Compl. (Doc. 1) at 21, col. 5 ll. 19–20.

[155] Joint Claim Chart (Doc. 63) at 4; Ex. A ('416 Patent) to Compl. (Doc. 1) at 21, col. 5 l. 38.

[156] Joint Claim Chart (Doc. 63) at 4.

[157] *Id.* at 4–5.

PVM primarily supports its construction by pointing to examples where the word "profile" was used to describe the barbed portion in the specification and prosecution history.[158] But none of the examples use the word "raised" to modify "profile." And that's not the only flaw in PVM's preferred construction. PVM's preferred construction is so vague that adopting it would actually create a greater risk of jury confusion than simply using the claim term "barbed portion" without further construction. This is because the "raised profile" language requested by PVM could refer to any number of shapes, including shapes that would make it impossible for the claimed invention to work. For example, (as illustrated in PPC's briefing) a rounded bump would fulfill PVM's definition, but it would not create the mechanical interlock that is the primary purpose of the '416 Patent.[159] In short, PVM's proposed construction is untenable.

Unlike PVM's proposed construction, PPC's construction at least has the benefit of adding clarity (over and above the term "barbed portion") for the jury. But that doesn't necessarily mean it should be adopted. PVM forcefully objects that, in its view, PPC's construction improperly "read[s] a functional limitation into a structural limitation."[160] PVM argues that the Federal Circuit's caselaw sets forth a hard-and-fast rule that language describing functionality has no place in construing a term found in a structural limitation.[161]

Although the issue is not entirely free from doubt, the Court reads the relevant caselaw differently than PVM reads it. In a 2010 case called *Funai Electric Co., Ltd. v. Daewoo Electronics Corp.*, the Federal Circuit explained that:

> The use of . . . functional language to construe and explain a claim term is not improper. A description of what a component does may add clarity and

---

[158] Def.'s Opening Claim Construction Br. (Doc. 71) at 32.

[159] *See* Pl.'s Resp. Claim Construction Br. (Doc. 74) at 21.

[160] Def.'s Resp. Claim Construction Br. (Doc. 73) at 17; *see also* Oct. 16, 2023 Markman Hr'g Tr. (Rough) at 96.

[161] *See* Oct. 16, 2023 Markman Hr'g Tr. (Rough) at 96–97.

understanding to the meaning and scope of the claim. The criterion is whether the explanation aids the court and the jury in understanding the term as it is used in the claimed invention.[162]

*Funai* provides the appropriate rule to employ. At the very least, given *Funai,* which post-dates all the cases cited by PVM in its briefing and at the Markman Hearing, the Court does not accept the existence of the hard-and-fast rule that PVM asserts.[163]

Everyone in this case agrees that "form[ing] a mechanical interlock" is what the barbed portion does in the context of this Patent.[164] Much more importantly, the formation of that mechanical interlock is essential to understanding the term "barbed portion" in the context of the Patent.[165] That is because, in the context of this Patent, the barbed portion must be a particular shape such that it can form a mechanical interlock. And more than one shape can fulfill that requirement. So the only way for the Court to ensure that the jury will understand the universe of shapes that fulfill the limitation at issue is by including the functional language in its construction of the disputed term. Including such language therefore adds significant clarity to the term "barbed portion." Because it will aid the jury substantially in understanding the term "barbed portion," the Court agrees that PPC's requested functional language should be included in the construction.

---

[162] 616 F.3d 1357, 1366 (Fed. Cir. 2010).

[163] In its initial briefing, PVM cites to *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1468 (Fed. Cir. 1990), in support of its supposed hard-and-fast rule. Def.'s Opening Claim Construction Br. (Doc. 71) at 33. *Hewlett-Packard* teaches that "apparatus claims cover what a device *is*, not what a device *does*." 909 F.2d at 1468. But that is a far cry from holding that functionality can never be used to define a structural term. In its reply briefing, PVM cites *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001), to support its supposed rule that "a court may not import functional limitations that are not recited in the claim." Def.'s Resp. Claim Construction Br. (Doc. 73) at 17. But *Wenger*'s admonition was in the context of construing a means-plus-function limitation. This language does not appear to readily apply to a claim term in a structural limitation. If it did, *Funai* (which post-dates *Wenger*) would have overruled it.

[164] *See* Oct. 16, 2023 Markman Hr'g Tr. (Rough) at 78; Def.'s Opening Claim Construction Br. (Doc. 71) at 19.

[165] *See* Oct. 16, 2023 Markman Hr'g Tr. (Rough) at 85 ("[W]ithout a mechanical interlock, something that's catching and preventing the cable from being pulled backwards, you don't have a barb.").

The rest of PPC's proposed construction is supported by the intrinsic record. As PPC argued at the Markman Hearing, each of the drawings included in the '416 Patent shows the "barbed portion" having a raised edge that projects radially outward from the tubular portion of the post.[166] Even though the words "raised edge" do not appear in the Patent, they accurately describe the illustrations of the embodiments disclosed in the Patent.

Thus, the Court will construe the claim term as follows: "the post has a barbed portion, which is a raised edge that projects radially outward from the tubular portion of the post so as to form a mechanical interlock with the cable when the elastomeric band is compressed radially outward of the barbed portion and squeezed inward onto the cable."

## VI.    Disputed Term #6

The sixth term at issue appears identically across three different claims (1, 4, and 8).[167] That term is "an elastomeric band."[168] PPC says that no construction of the term "an elastomeric band" is necessary.[169] But PPC also says that, if the Court believes construction is warranted, this term should be construed in the same manner as it was in the parties' prior litigation before the federal district court in Minnesota.[170] That construction is the same construction that PVM proposes in the instant case:

> A thin, flat and encircling strip of elastomeric material that has a width greater than its thickness. The "width" of an elastomeric band extends along the axial direction of the connector. The "thickness" of the elastomeric band extends in the radial direction of the connector.[171]

---

[166] Oct. 16, 2023 Markman Hr'g Tr. (Rough) at 99.

[167] Joint Claim Chart (Doc. 63) at 5.

[168] *Id.*

[169] *Id.*

[170] *Id.*

[171] Def.'s Opening Claim Construction Br. (Doc. 71) at 34 (quoting *John Mezzalingua Assocs., Inc. v. Pace Elecs., Inc.*, No. 0:10-cv-00064-MJD-JJG, 2011 WL 3100280, at *5 (D. Minn. July 22, 2011)); Pl.'s Opening Claim Construction Br. (Doc. 72) at 28 ("[I]f the Court believes that additional information should be provided, the parties agree that the term 'an elastomeric band' should be construed as 'a thin, flat and encircling strip of elastomeric material

The Court adopts this construction. The Federal Circuit is clear that "the court's obligation is to ensure that questions of the scope of the patent claims are not left to the jury."[172] And, in the Court's view, the term "an elastomeric band" needs further definition for a layperson to understand the meaning of that term as it is used in the relevant claims in this Patent.

In addition to mirroring the construction used by the district court in Minnesota, the construction tracks with the description of the elastomeric band in the specification: "'Band' is used in the sense of a flat strip, i.e., the width is greater than the thickness. (The 'length' would be the circumference of the band, with the width being in the radial direction.)"[173] In any event, the parties generally agree this construction is appropriate.[174]

Thus, the Court construes the claim term as follows: "a thin, flat and encircling strip of elastomeric material that has a width greater than its thickness. The 'width' of an elastomeric band extends along the axial direction of the connector. The 'thickness' of the elastomeric band extends in the radial direction of the connector."

## VII.    Disputed Term #7

The seventh term at issue, "fitted inside a cavity," appears in slightly different forms across three claims.[175] In claim 1, the relevant language reads: "an elastomeric band fitted inside a cavity formed at least in part by said compression member."[176] In claim 5, the relevant language reads:

---

that has a width greater than its thickness. The "width" of an elastomeric band extends along the axial direction of the connector. The "thickness" of the elastomeric band extends in the radial direction of the connector.").

[172] *Every Penny Counts, Inc. v. Am. Express Co.*, 563 F.3d 1378, 1383 (Fed. Cir. 2009).

[173] Ex. A ('416 Patent) to Compl. (Doc. 1) at 19, col. 2 ll. 40–43.

[174] *See* Joint Claim Chart (Doc. 63) at 5; *see also* Oct. 16, 2023 Markman Hr'g Tr. (Rough) at 107 ("But if you feel like we should [construe the term], then I think both parties agree that the Minnesota court accurately captured what the band is."); *id.* ("[I]s there any prejudice if you tell the jury [it's] this. There's not. Both sides agree [the Minnesota court's construction is] accurate.").

[175] Joint Claim Chart (Doc. 63) at 5–6.

[176] *Id.* at 5.

33

"said elastomeric band is fitted inside a cavity formed at least in part by said compression member."[177]    In claim 8, the relevant language reads "fitting an elastomeric band into a cavity formed at least in part by said compression member."[178]

The parties' proposed constructions of the claim terms are significantly different.    PPC proposes the following construction:    "the compression member has an internal cavity and the elastomeric band fits inside that cavity."[179]    PVM, on the other hand, proposes that:    (1) "fitted inside" and "fitting . . . into" both "mean[] the elastomeric band is sized and shaped to conform to the interior portion of the cavity and not extend outside it";[180] and (2) "'[c]avity' means a contained area that surrounds the elastomeric band in all directions except radially inward toward the cable."[181]    Each party has good arguments in favor of its proposed construction and against the other side's proposed construction.

PVM says that PPC's proposed construction does not adequately define terms, but instead merely rearranges them.[182]    PVM has a point.    It is certainly the case that PVM's proposed construction does more by way of defining disputed terms.    But that doesn't necessarily mean PVM's more detailed construction is entirely right either.    The Court must still examine PVM's construction closely.

Let's start with the "fitted inside" or "fitting . . . into" language.    PVM's desired construction would mean that the elastomeric band, when it is in its pre-compressed state, (1) needs

---

[177] *Id.*

[178] *Id.* at 5–6.

[179] *Id.* at 5.

[180] *Id.*

[181] *Id.*

[182] Def.'s Resp. Claim Construction Br. (Doc. 73) at 19.

to be entirely within the cavity, and (2) needs to completely fill the cavity.[183]  With respect to the first point, PVM's best argument is that the language of the Patent claims themselves support its construction.  Consider, for example, claim 1.  The relevant disputed language in that claim is "an elastomeric band *fitted inside* a cavity."[184]  But elsewhere in that claim, a post is described as being "*fitted at least partially inside* said connector body."[185]  The implication of the change in language is impossible to ignore.  "Fitted inside" must mean entirely inside.  Otherwise, what work would the "at least partially" language be doing in the description of the post?[186]

Nothing either party has pointed to in the specification, prosecution history, or dictionary definitions of the word "fitted" suggests that the "fitted inside" language from the Patent claims really means "fitted at least partially inside."  If anything, the opposite is more likely.  Given the clarity of the claim language itself and the fact that the specification does not muddy those waters, there is no need to delve deeper here on this first point.

We now turn to PVM's desire for a construction that requires that the elastomeric band completely fill in the cavity.  On this second point, PPC wins the day.  At best for PVM, the claim language is ambiguous as to whether "fitted inside" and "fitting . . . into" means anything more than that the band "fits inside" or can be made "to fit inside" the cavity.  If it means simply "fits inside" or "to fit inside," this would require only that the band be positioned entirely inside the

---

[183] Def.'s Opening Claim Construction Br. (Doc. 71) at 36–37.

[184] Ex. A ('416 Patent) to Compl. (Doc. 1) at 20, col. 4 l. 66.

[185] *Id.* at 20, col. 4 ll. 61–62.  This same linguistic juxtaposition can be seen in claim 8.  *Compare id.* at 21, col. 5 l. 43, *with id.* at 21, col. 5 ll. 38–39.

[186] *Cf. Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 809–10 (Fed. Cir. 2021) ("[B]ecause every buffer in our (physical) world is ultimately implemented on a physical device (*i.e.*, hardware), a 'hardware buffer' must mean something more than just a 'buffer implemented in hardware,' as Intel urges, or else the word 'hardware' would be erased from the claims.  That consequence, while not inevitably disqualifying a construction in every patent, is counter to an important principle of interpretation, for patent claims as for statutes:  'It is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous.'" (quoting *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1288 n.10 (Fed. Cir. 2017))).

cavity.  It would not require the band to completely fill the cavity.  The Court acknowledges PVM's point that "fitted inside" and "fitting . . . into" are different phrases than "fit[s] inside," but it is not clear whether the distinction connotes a material difference.

Things get clearer when we look at the disputed language in the context of the specification. When discussing the elastomeric band, the specification explains that "[t]he length of [the] band . . . *can be* equal to the length of the cavity in which it is seated."[187]  "Can be" very clearly implies "does not have to be."  And if the length of the band does not have to be the length of the cavity, then the band does not need to fill the entire cavity in its pre-compressed state.  That clears up any ambiguity that might have existed if we were looking at the claim terms in a vacuum.

PVM primarily relies on dictionary definitions for its argument that the band must take up the entire space of the cavity.[188]  But, as PPC notes, the use of extrinsic evidence like dictionary definitions can confuse as easily as it can aid.[189]  In *Enviro Tech*, this Court stated that "extrinsic evidence comes inside a break-glass-in-case-of-emergency package with a use-with-extreme-care warning label."[190]  Given the clarity brought to the term by way of the specification, we are not in an emergency that requires the use of extrinsic evidence.  Accordingly, the Court will simply note that the definitions of "fitted" provided by PVM are not the only definitions of that word (or the word "fitting") and that other definitions are less helpful to PVM.[191]

---

[187] Ex. A ('416 Patent) to Compl. (Doc. 1) at 20, col. 4 ll. 41–43.

[188] *See* Def.'s Opening Claim Construction Br. (Doc. 71) at 40–41.

[189] Pl.'s Resp. Claim Construction Br. (Doc. 74) at 28.

[190] 2022 WL 17721179, at *5.

[191] *See, e.g.*, *Fit*, Ex. b(1), MERRIAM WEBSTER'S DICTIONARY, https://www.merriam-webster.com/dictionary/fit (last visited Mar. 2, 2025) (defining fit, fitted, or fitting as "to insert or adjust until correctly in place"); *see also Fit*, Ex. 7, DICTIONARY.COM, https://www.dictionary.com/browse/fit (last visited Mar. 2, 2025) (defining fit, fitted, or fitting as "to put with precise placement or adjustment); *Fit*, Ex. 2(2)(a), THE BRITANNICA DICTIONARY, https://www.britannica.com/dictionary/fit (last visited Mar. 2, 2025) (defining fit, fitted, or fitting as "to go into or through a particular space").

PVM's other argument is that the embodiments in the specification all show a band that fully fills the cavity. PPC responds that this is an attempt to "re-write the claims to include limitations" in order "to manufacture a non-infringement defense out of thin air."[192] Specifically, PPC asserts that nothing in the claims, specification, or prosecution history requires that the elastomeric band fill the entirety of the cavity or not extend outside of it.[193] PPC's point is that the embodiments can't be used to artificially limit the scope of the asserted claims. That is, although the "filled up" configuration is *allowed* by the Patent, the Patent doesn't *require* it.[194] PPC is correct, and this distinction is important. The Federal Circuit instructs against importing optional features described in the specification into the claims as limitations.[195]

Lastly, we address PVM's requested construction of the term "cavity." PVM wants to define cavity as "a contained area that surrounds the elastomeric band in all directions except radially inward toward the cable."[196] But the Patent does not require that the cavity surround the elastomeric band in all directions except radially inward toward the cable.[197] All that the claims require—and that the specification and prosecution history describe—is a "cavity" that is "formed

---

[192] Pl.'s Opening Claim Construction Br. (Doc. 72) at 29.

[193] *Id.*

[194] *Id.*

[195] *See i4i Ltd. P'ship*, 598 F.3d at 843–44. For example, when the specification contains "permissive language," (e.g., "could be edited," "can be created," and "ability to work") the permissive language "does not clearly disclaim systems lacking these benefits." *Id.* at 844. Here, the specification provides for examples of elastomers, including "thermoplastic elastomer (TPE), silicone rubber, or urethane," and describes the key properties of the band: (1) "resilience," (2) "resistance to creep," (3) "resistance to compression set," and (4) "the creation of a good grip with the cable jacket." Ex. A ('416 Patent) to Compl. (Doc. 1) at 20, col. 4 ll. 37–41. While the '416 Patent recites these four required properties of the elastomeric band, nowhere does it mention PVM's requested limitation that the band must conform to the shape of the cavity or stay entirely inside the cavity before or after compression. Rather, the claim uses language of permission—"the length of band 26 . . . can be equal to the length of the cavity in which it is seated"—not language of limitation. *Id.* at 20, col. 4 ll. 41–43. And as the Federal Circuit has instructed, "[w]e do not read limitations from the specification into claims; we do not redefine words. Only the patentee can do that." *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012).

[196] Joint Claim Chart (Doc. 63) at 5.

[197] *See* Pl.'s Opening Claim Construction Br. (Doc. 72) at 30.

at least in part by" a "compression member fitted to [a] connector body radially outward of the barbed portion of the post."[198]  Moreover, in the Court's view, PVM's proposed construction poses risks of juror confusion.  Things can, and therefore should, be much simpler.  A cavity as described in the claims—in context of the specification—is empty space.  But all jurors would know that, and nothing is gained from further construction of a term that jurors will readily understand.

For the foregoing reasons, the Court construes the disputed claim term as follows:  "the compression member has an internal cavity and, in a pre-compression state, the elastomeric band fits entirely inside that cavity (without extending beyond it)."

## VIII.    Disputed Terms #8 and #9

The Court will address the eighth and ninth terms together—because the parties generally agree that those terms will be resolved in a similar fashion to each other and in a similar fashion to Disputed Term #1.[199]  The eighth term at issue appears slightly differently across two different claims.  In claim 1, it reads:  "wherein axial movement of said compression member onto said connector body causes said elastomeric band to deform and seal an outer layer of said cable to said connector to isolate an inside of said connector from environmental influences."[200]  In claim 8, it reads:  "wherein axial movement of said compression member onto said connector body causes said elastomeric band to deform and seal against an outer layer of said cable radially outward of the barbed portion of the post."[201]  The ninth term at issue appears in claim 4:  "an elastomeric

---

[198] Ex. A ('416 Patent) to Compl. (Doc. 1) at 20, col. 4 ll. 64–67.

[199] *See* Def.'s Opening Claim Construction Br. (Doc. 71) at 42–43; *see also* Pl.'s Opening Claim Construction Br. (Doc. 72) at 31–33.

[200] Ex. A ('416 Patent) to Compl. (Doc. 1) at 21, col. 5 ll. 1–5.

[201] *Id.* at 21, col. 5 ll. 48–52.

band radially outward of said barbed portion, said band forming a seal against an outer layer of said cable."[202]

Both parties acknowledge that the Court's resolution of these terms should be driven by its resolution of Disputed Term #1.[203]  The Court's resolution of Disputed Term #1 was to adopt PPC's proposed construction and reject PVM's arguments to the contrary.  For the reasons set out in that part of today's Order, the Court will adopt PPC's constructions of Disputed Term #8 and Disputed Term #9.

So, for the second version of Disputed Term #8 and for Disputed Term #9, the Court construes the claim term as follows:  "the post has a barbed portion and, upon compression, the elastomeric band forms a seal radially outward of the barbed portion of the post."  The first version of Disputed Term #8 is slightly different because PPC requests that the Court's construction "be explicit that the deformation of the elastomeric band radially outward of the barb is done 'to isolate an inside of said connector from environmental influences.'"[204]  Essentially, PPC is asking the Court to contextualize the construction by adding additional language from the Patent claim itself.  PVM does not specifically challenge this portion of PPC's request in its briefing.  So, for the first version of Disputed Term #8, the Court provides the following construction:  "the post has a barbed portion and, upon compression, the elastomeric band forms a seal radially outward of the barbed portion of the post to isolate an inside of said connector from environmental influences."

---

[202] *Id.* at 21, col. 5 ll. 20–22.

[203] PVM states pretty directly that the resolution of Disputed Terms #8 and #9 should mirror that of Disputed Term #1. *See* Def.'s Opening Claim Construction Br. (Doc. 71) at 42–43 (stating that, regarding Disputed Term #8, "[f]or all the reasons discussed above with respect to [Disputed Term #1], the Court should adopt PVM's proposed construction"); *see also id.* at 43 (stating that, regarding Disputed Term #9, "[f]or all the reasons discussed above with respect to [Disputed Term #1], the Court should adopt PVM's proposed construction").  PPC, for its part, makes very similar arguments, relying on the same pieces of the Patent's prosecution history to support its similar requested constructions across Disputed Terms #1, #8, and #9.  *Compare* Pl.'s Opening Claim Construction Br. (Doc. 72) at 17–19, *with id.* at 31–33.

[204] Pl.'s Opening Claim Construction Br. (Doc. 72) at 33.

IT IS SO ORDERED this 23rd day of May 2025.[205]

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

[205] The Court wishes to remind the parties that there is needed supplemental briefing described *supra* at page 26.